## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**DAVID DOE**, *et al.*,

        **Plaintiffs,**

**v.**

        **Case No.: 2:09-cv-0367**
        **JUDGE SMITH**
        **Magistrate Judge Abel**

**BIG WALNUT LOCAL SCHOOL
DISTRICT BOARD OF
EDUCATION**, *et al.*,

        **Defendants.**

## OPINION AND ORDER

Plaintiffs David, Mary and John Doe initiated this action against Defendants Big Walnut Local School District Board of Education, Principal of the Big Walnut Middle School, Stephen House, and the Superintendent April Domine, alleging violations of their substantive due process rights, the Americans with Disabilities Act, and state law claims. This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 27). The motion is fully briefed and now ripe for review. For the reasons that follow, Defendants' Motion for Summary Judgment is **GRANTED**.

As a preliminary matter, Plaintiff recently filed a Motion for Leave to File a Supplemental Affidavit (Doc. 71).  Defendants oppose Plaintiff's Motion.  The Court, however, finds that Plaintiff is simply clarifying information submitted in his first affidavit, and there is no prejudice to Defendants.  Accordingly, Plaintiff's Motion is **GRANTED**.

## I.    FACTS

Plaintiffs David and Mary Doe are individuals who reside in Delaware County, Ohio, and bring this suit on behalf of their minor son, John Doe, who resides with them.  Plaintiff John Doe is a student in the Big Walnut Local School District ("Big Walnut").  He has been diagnosed with Cognitive Disorder, which includes difficulty in social interactions.

Defendant Big Walnut Local School District Board of Education ("School Board") is responsible for implementing the laws, policies, regulations, and procedures for Big Walnut.  Defendant April Domine is the Superintendent of Big Walnut.  Defendant Stephen House is the Principal of the Big Walnut Middle School.

Plaintiff John Doe attended the Big Walnut Middle School during the 2005-06, 2006-07, and 2007-08 school years, and now is a student at Big Walnut High School.  John Doe's cognitive disability limits his capability to learn as quickly as other students and inhibits his ability to multi-task.  Due to his disability, John Doe has an Individualized Education Plan ("IEP").  The IEP sets forth interventions to assist John Doe with his education and social interaction.  John Doe's May 1, 2004 IEP stated:

        a.      Interpersonal problems: very significant;

        b.      Inappropriate behaviors/feelings: significant;

        c.      Depression: very significant;

        d.      Physical symptoms/fears: very significant.

(Mary Doe Depo. Ex. 2).

In a subsequent IEP, dated May 24, 2007, it was reported that John Doe "continues to indicate well below average general intellectual functioning deficits in his overall adaptive behavior as well as significant deficits in the areas of self-direction and communication." (Mary Doe Depo. Ex. 10).

To assist John Doe's educational progress, he was placed in a Resource Room at the Big Walnut Middle School. Resource Rooms are for students with disabilities, who are provided services mandated by federal and state law. Students with disabilities are encouraged to receive instruction in a regular classroom, and in this situation, a teacher or assistant from the Resource Room would accompany the student with the disability to a regular classroom. Thus, a student with a disability would have the support of two instructors. (House Aff. ¶¶ 12-17).

John Doe's teachers indicated that he had difficulty distinguishing between proper and improper behavior in certain settings. He acted inappropriately in class sometimes, which interrupted class and caused negative interaction with his peers. (House Aff. ¶20). According to Defendants, John Doe's behavior and sometimes difficult interaction with other students was never identified as being a result of John Doe's cognitive disability, thus the school's code of conduct applied to him. (House Aff. ¶ 20, Ex. A).

Defendant House, as principal, was aware of several incidents involving John Doe and other students at Big Walnut Middle School, including teasing, pushing, punching, name-calling, and throwing food. (House Aff. ¶¶ 22-23). Such incidents of inappropriate conduct that was observed by school officials or brought to the attention of school officials was investigated. These investigations revealed that in some instances John Doe was the aggressor or initiator and in others he responded or mutually engaged in the behavior. At all times, appropriate action was taken depending upon the circumstances including but, not limited to, talking to the students

-3-

about the situation to resolve the matter, lunch detention, after-school detention, separation of the students in the classroom, and suspension from school.  (*Id.*).

Prior to April 17, 2007, John Doe's parents contacted Defendant Principal House regarding some of the incidents that John Doe was involved in with other students.  Principal House had several conversations with John Doe's parents and informed them that actions were taken, including discipline, to address these situations.  Defendant House describes that at no time did the school ever ignore an incident between John Doe and another student that was brought to its attention by John Doe, his parents, or otherwise.  (House Aff. ¶¶ 24-25).  Plaintiffs David and Mary Doe expressed concern that John Doe was in IEP classes with students who would bully and taunt him.[1]

On April 17, 2007, John Doe was involved in a fight with two other students in which his nose was broken.  (House Aff. ¶26).  Plaintiff John Doe described the fight as follows:

> Q.     So it's now after school on April 17th, 2007.  Did you know that they were looking for you to fight?
>
> A.     No.[2]
>
> Q.     All right. So what happens?
>
> A.     I'm usually walking with my friends to the bus, and 41 comes up and just hits me in the nose.  And then the next thing I know, I'm down.  Like, I

---

[1] Plaintiffs Memorandum in Opposition details the exact classmates who were bullying John Doe, and were involved in altercations with him.  The other students are identified by numbers to protective their identities in accordance with the Agreed Protective Order (Doc. 23).  Plaintiffs further provide detailed summaries of other incidents at the Big Walnut Middle School, that do not involve John Doe, and are incorporated by reference.  (*See* Pls.' Memo. in Opp. at 6-10).

[2] An investigation conducted by Big Walnut indicated that John Doe may have been a willing participant in the fight, and some students even indicated that John Doe set out ground rules for the fight.  (House Aff. Ex. D).

just feel underneath my nose, there's blood all over my hand.  I look up,
the next thing I know, 26 comes up behind me, kicks me in the head,
knees me in the nose a couple of times and kicks me on the ground.  They
just walk away like nothing happened.  I get up, walk to the bus, blood
dripping out everywhere, spitting out blood, and the bus driver gives me
tissues, and they call the principal, and I go to the office.

Q.    You threw a punch in that fight, didn't you?

A.    No.

Q.    You don't remember throwing a punch in that fight?

A.    I absolutely did not throw a punch.  I did not have a chance to throw a
punch.

Q.    If there were student reports that say you threw a punch, they would be
lying?

A.    They must be lying.  There is no way I could throw a punch.

(John Doe Depo. at 30-31).

Plaintiff John Doe waited in the Principal's office as his father, David Doe, was called to

pick him up.  No medical or law enforcement personnel were called to the scene.  When David

Doe arrived at the school, he saw his son's blood leading to the office.  (David Doe Depo. at 92-

97).  As a result of the fight on April 17th, the two other students involved were suspended from

school for three days, and Plaintiff John Doe was not disciplined.  (House Aff. ¶28).  Defendant

Domine, the Superintendent of Big Walnut Local School District, did not become aware of John

Doe or any incidents or altercations he may have been involved with until sometime during the

summer of 2007 before John Doe entered the eighth grade at Big Walnut Middle School.

(Domine Affidavit ¶¶1, 13).

During the summer of 2007, Defendants were contacted by legal counsel for the Does.

(House Aff. ¶29; Domine Aff. ¶14).  House subsequently devised a safety plan and submitted the

plan to Domine. (House Aff. ¶30; Exhibit F to House Aff.; Domine Aff. ¶14). This safety plan included apprising John Doe's teachers of the physical and emotional concerns resulting from the April 17th fight; adjusting the schedules of the students involved in the fight to ensure the least amount of interaction time between these students and John Doe; requiring John Doe to see Mr. Myers, a guidance counselor selected personally by John Doe, each morning and report any incidents or other concerns John Doe may have; and requiring John Doe to notify House, Linda Snouffer (Dean of Discipline), or Mr. Jay Walker (Asst. Principal) immediately upon any alleged harassment from other students. (House Aff. ¶30; *see also* Mary Doe Depo. at 174-76). John Doe's parents approved of this plan. (House Aff. ¶31). After this safety plan was initiated, Big Walnut officials reviewed the safety plan in late-October/early-November 2007. (*Id.* at ¶¶31, 32; Domine Aff. ¶15, 16). Although some of the strategies employed in the initial safety plan were working, additional measures were implemented because John Doe was still having difficulty with some students. *Id.* These additional measures included excusing John Doe from class early to lessen the interaction he had with students in the hallway; finding more discreet ways of having John Doe communicate with Mr. Myers; assigning a teacher's aide to monitor John Doe in the hallway, at lunch and on the playground; and allowing John Doe to use the restrooms in the office if he desired. (House Aff. ¶¶32, 34; Domine Aff. ¶¶16-17).

On January 24, 2008, Domine held a meeting with John Doe's teachers and others who assisted John Doe to discuss additional goals and strategies to help John Doe learn to deal with difficult social situations. (House Aff. ¶35; Domine Aff. ¶18). Thereafter, John Doe participated in exercises with his teacher and others to help him identify the type of interactions he was involved with and whether his responses were appropriate to the situation. (House Aff. ¶35; Domine Aff. ¶19). Moreover, school officials kept in contact with John Doe's parents and

made sure that the parents and John Doe had a line of communication open with the school.

(House Aff. ¶36; Domine Aff. ¶¶20-21).  Despite the safety plan, John Doe did inform school

officials of incidents where students teased or taunted him.  (House Aff. ¶37; Domine Aff. ¶22).

Plaintiff Mary Doe detailed the incidents that occurred after the fight on April 17th, as follows:

- 9/28/07:  25 pushed 1 [John Doe] in the hallway after class and threatened to hit him. Incident was verbally reported to Mr. Myers.
- 10/02/07:  25 (who had a locker right next to 1) pushed his locker door against 1's and kept 1 from opening his locker. Incident was verbally reported to Mr. Myers.
- 10/04/07:  While walking through the hallway 1 went past 25 and a student named B____ (last name unknown) while 25 was enticing B____ to start a fight with 1. Incident was verbally reported to a teacher.
- 10/05/07:  While at the football game, 36 ran up behind 1, jumped up in the air, came down on 1 and tackled him to the ground. Afterward, 1 was throwing a football back and forth with 331 while 170 came up behind 1, picked him up and slammed 1 to the ground, injuring his shoulder. 32 jumped in and aided 170 by tackling 1 and 331 and pushing them to the ground. Incident was verbally reported to Mr. House and Mr. Walker and followed up by a written report.
- 10/08/07:  25 threatened to fight with 1 and told him the sling he had on his arm (from the incident at the football field) was fake. Incident was verbally reported to a teacher who told 1 to stop overreacting.
- 10/09/07:  25 threatened to hit both 1 and 327. Incident was verbally reported to Mr. House.
- 10/10/07:  After the pep rally 1 was walking to the bus and looked over his shoulder. 26 happened to be there (even though he was sanctioned from being in extracurricular activities because of previous issues) and saw 1 look his way. He told 1 not to look at him or he would break 1's nose again. He continued to yell things as 1 walked away and got on the bus, but 1 didn't hear what he was saying. Incident was verbally reported to Mr. Myers and followed up by a written report.
- 10/12/07:  During a math exam, 25 was laughing and making inappropriate comments out loud which distracted everyone's ability to take the exam. When 1 looked his way, 25 was making inappropriate hand signs and gestures at 1. Incident was verbally reported to Ms. Barr.
- 10/29/07:  25 pushed 1 by throwing his body weight against him in the restroom. Incident was verbally reported to a teacher.
- 11/5/07:  While throwing the football with some friends at recess, the ball went near 26. 1 went to pick the ball up and 26 told 1 that he was going to "bust him up." Incident was verbally reported to Mr. House.

- 12/03/07: During lunch 369 was pushing and hitting 1 in the back of the head. This taunting continued after lunch down the hallway to class. Incident was verbally reported to Mr. House.
- 12/05/07: 217 made hand motions to 1 like he was trying to shoot 1. Incident was verbally reported to a teacher.
- 12/06/07: 369 flicked objects at 1 during lunch and hit 1 on the head with his water bottle. 369 was also elbowing 327 during this time. Incident was verbally reported to Mr. Myers during lunch. Mr. Myers responded by telling 1 to find another seat. 1 responded that there wasn't a place left to sit where kids are not mean to him.
- 1/16/08: 25 continually kicked 1 during lunch and pushed another child into 1. Incident was verbally reported to Mr. House, but was apparently not followed up on.
- 5/07/08: 26 found out that 1's dog died the previous day and yelled "Ha, ha, your dog died" at 1 repetitively. Incident was reported to Mr. House and Mr. Walker.
- 5/30/08: After several kids warned 1 that 26 and his group of friends including 30, 24, 39, and a few others were talking about jumping 1 after school, 1 overheard 26 making plans on how to do it. Incident was verbally reported to Mr. House, Mr. Walker, Mrs. Snouffer, and Mr. Myers. Staff instructed 1 to leave five minutes early from class to go to the bus, thus punishing 1 and not the troublesome students.
- 6/2008: Last day of school. Early in the morning, 369 pushed 1 into 39, who then pushed 1 into a glass jar, which broke. The incident occurred in Mr. McGann's classroom, but no teacher was in the room. 1 was sent home, allegedly for his own protection, even though he was not accused of any wrongdoing.
- 9/04/08: During math class, 26 made hand gestures to 1 referring to 1 getting his nose broken. The gestures were in a threatening manner. 26 was also singing "drip, drip, gonna make your nose bleed" to 1. Incident was verbally reported to Mr. House and Mr. Walker.
- 9/12/08: During the football game a couple of kids warned 1 and his sister 3 that 26 was trying to get them to attack 1. 26, 39, and 18 kept walking past where 1 was sitting on the bleachers and watching him as though they were planning something. Twice 39 and 18 walked up to 1 and each time 39 stood toe to toe with 1 and threatened to beat him up. 1 left early from the game while a few acquaintances told him that 26 and his friends were looking for 1. Incident was verbally reported to the office.
- October 2008: 129 told 3, 321, 333 and 344 that he was going to go to 1's home and shoot him. Incident was verbally reported to the office and followed by a written report. Incident was followed up by involving the Sunbury Police Department and making reports.
- Mr. Meyers was assigned to watch lunch room behavior but often ignored the incidents and looked away. 1 saw Mr. Myers watching incidents and make eye contact only to look away like he hadn't seen it. When 1 would

> mention what had happened Mr. Myers basically told him to blow them
> off so they would leave 1 alone. A few of the incidents ended in
> suspension or after-school detention for the students. The incidents where
> Mr. Walker was brought in seemed to be the ones that were taken care of
> but other administrators made 1 feel like they thought he was the problem.
> 26 was assigned to classes with 1 on a few occasions after it was agreed to
> keep him apart from 1.

(Mary Doe's Responses to Interrogatories, summarized in Pls.' Memo. in Opp. at 13-16).

In the fall of 2008, John Doe entered Big Walnut High School.  In order to address John Doe's needs, the safety plan was modified to ease some of the structure surrounding John Doe. Domine reiterated to Mary Doe the importance of keeping a line of communication open with the school in case John Doe's parents became aware of a situation before Big Walnut so that the school district could address the situation.  (Domine Aff. ¶23).

Plaintiffs further describe that as a result of the injuries John Doe suffered at school, he had to have two surgeries.  His medical bills are over $30,000, and he has had to endure months of pain and suffering from the injuries, as well as exclusion from ordinary physical activities.

## II.    STANDARD OF REVIEW

The standard governing summary judgment is set forth in Rule 56 of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is appropriate, however, if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at

trial.  *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.,* 328 F.3d 870, 873 (6ᵗʰ Cir.

2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also Matsushita Electric*

*Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must view all the facts,

evidence and any inferences that may permissibly be drawn from the facts, in favor of the

nonmoving party.  *Matsushita*, 475 U.S. at 587.  The Court will ultimately determine whether

"the evidence presents a sufficient disagreement to require submission to a jury or whether it is

so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-53.

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there

are genuine issues of fact to be tried.  *Lashlee v. Sumner*,  570 F.2d 107, 111 (6ᵗʰ Cir. 1978).  The

Court's duty is to determine only whether sufficient evidence has been presented to make the

issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility

of witnesses, or determine the truth of the matter.  *Liberty Lobby*, 477 U.S. at 249; *Weaver v.*

*Shadoan*, 340 F.3d 398, 405 (6ᵗʰ Cir. 2003).

In responding to a summary judgment motion, the nonmoving party "cannot rely on the

hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present

affirmative evidence in order to defeat a properly supported motion for summary judgment.'"

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6ᵗʰ Cir. 1989) (*quoting Liberty Lobby*, 477

U.S. at 257).  The existence of a mere scintilla of evidence in support of the opposing party's

position is insufficient; there must be evidence on which the jury could reasonably find for the

opposing party.  *Liberty Lobby*, 477 U.S. at 252.  The nonmoving party must present "significant

probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the

material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6ᵗʰ Cir. 1993).  The

-10-

Court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence.  *Liberty Lobby*, 477 U.S. at 251-52; *see also Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact."  *Street*, 886 F.2d at 1479-80.  That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.  *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

### III.    DISCUSSION

Defendants move for summary judgment and/or qualified immunity on Plaintiffs' substantive due process claim, Americans with Disabilities Act Claim, and state law claim under the Ohio Political Subdivision Tort Liability Act.  The Court will address each of Plaintiffs' claims in turn.

### A.    Substantive Due Process Claim

Plaintiffs allege that Defendants violated John Doe's substantive due process right by failing to protect him from "physically aggressive behavior" from other students.  (Compl. ¶ 20). Plaintiffs bring this claim under 42 U.S.C. § 1983, which provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State. . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress .  .  .

This statute "is not itself a source of substantive right, but merely provides a method for vindicating federal rights elsewhere conferred."  *Graham v. Connor*, 490 U.S. 386, 393-94

-11-

(1989) (quoting *Baker v. McCollan*, 443 U.S. 137 (1979)). To prevail on a claim under § 1983, a plaintiff must prove: (1) that the defendant acted under color of law; and (2) that the defendant deprived the plaintiff of a right secured by the United States Constitution or federal statute. *See Adickes v. S.H. Kress & co.,* 398 U.S. 144, 150 (1970; *see also Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003).

The Fourteenth Amendment to the United States Constitution provides, in relevant part, that no State shall "deprive any person of life, liberty or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause has procedural and substantive components. As the Sixth Circuit explained in *Howard v. Grinage*, 82 F.3d 1343, 1350 (6th Cir. 1996), "substantive due process prohibits the government's abuse of power or its use for the purpose of oppression, and procedural due process prohibits arbitrary and unfair deprivations of protected life, liberty, or property interests without procedural safeguards." The substantive component of the Due Process Clause protects "fundamental rights otherwise not explicitly protected by the Bill of Rights" and serves "as a limitation on official misconduct which, although not infringing on a fundamental right," is so oppressive that it shocks the conscience. *See Howard*, 82 F.3d at 1349. Fundamental rights are those specifically guaranteed by the United States Constitution and those rights that are "implicit in the concept of ordered liberty." *Palko v. Connecticut*, 302 U.S. 319, 325 (1937). These generally include "the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (internal citations omitted).

Defendants argue that they are entitled to summary judgment on Plaintiffs' substantive due process claim because there is no general right to protection from private violence of other

-12-

members of society and because Defendants did not engage in any affirmative behavior that increased the risk of violence to John Doe.  Defendants assert that "[s]eldom are claims permitted where a plaintiff accuses a government official of failing to prevent a private party from injuring the plaintiff."  (Defs.' Mot. at 7, citing *Koulta v. Merciez, et al.*, 477 F.3d 442, 443 (6th Cir. 2007).   In evaluating this type of claim against a school board, the Court must apply a two-part test.  First, Plaintiff must have sufficiently established a constitutional violation.  *Doe v. Claiborne County*, 103 F.3d 495, 505 (6th Cir. 1996).  Second, the Court must determine whether the school board caused the constitutional violation.  *Id.* at 506.

## 1.    Constitutional Violation

Defendants argue that John Doe's constitutional rights have not been violated and Plaintiffs' claims therefore fail as a matter of law.  Defendants first argue that no special relationship existed between Defendants and John Doe giving rise to a constitutional duty to protect him from the acts of private individuals.

Plaintiffs, relying on *Doe*, 103 F.3d at 505, assert that students in a public school do have "a clearly established right under the substantive component of the Due Process Clause to personal security and to bodily integrity, [and] that such right is fundamental."  However, Defendants argue, and the Court agrees, that Plaintiffs arguments are misplaced.  In *Doe*, the Sixth Circuit held that a high school teacher who had sexually abused and statutorily raped one of his students violated that student's substantive due process rights.  The Sixth Circuit concluded that, "[i]f the right to bodily integrity means anything, it certainly encompasses the right not to be sexually assaulted under color of state law."  *Id.* at 506-07.  Despite Plaintiffs conclusory allegations, *Doe* is factually and legally distinguishable from the case at bar.  The Sixth Circuit's conclusion that a sexual assault clearly implicates the fundamental right to

"bodily integrity" does not extend to "verbal taunting" or bullying.  *See Marcum v. Board of Educ. of Bloom-Carroll Local School Dist., et al.*, 727 F. Supp. 2d 657, 673 (S.D. Ohio) (Holschuh, J.) ("Whereas a sexual assault clearly implicates the fundamental right to "bodily integrity," verbal taunting does not.").  Moreover, in *Doe*, the perpetrator of the sexual harassment was a teacher, a state actor.  However, in the case at bar, the individuals who have harmed John Doe are fellow students.  There is no question that the Substantive Due Process Clause protects individuals from abuses of governmental power, and does not impose a constitutional duty on the school to protect students from harm inflicted by private actors, such as their classmates.  *See DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 195 (1989).  Further, the Sixth Circuit held in *Soper ex rel. Hoben*, 195 F.3d 845, 853-54 (6th Cir. 1999), that there was no individual liability because there was no duty on the part of the school officials themselves to protect a student from acts of other students.  Accordingly, because the students who bullied and harmed John doe were private actors, not government officials acting under color of law, Defendants cannot be held liable under *DeShaney*.

Defendants point out that there are two exceptions to *DeShaney* and that Plaintiffs cannot establish a constitutional violation under either exception, which include: (1) where a state or local government agency takes a person into custody and restrains their liberty such that it renders the person unable to care for himself; and (2) the "state-created danger exception" when the state takes an affirmative act to increase the risk of harm to its citizens.  *Id.* at 199-200; *Koulta*, 477 F.3d at 445.

### a.    Duty to Protect

Defendants argue, and the Court agrees, that Plaintiffs cannot succeed under this first exception to *DeShaney* because in loco parentis and state compulsory attendance laws do not

sufficiently restrain students to raise a school's common law obligation to create and maintain a safe environment for its students to the rank of a constitutional duty. *See McQueen v. Beecher Cmty Schools*, 433 F.3d 460, 463 (6th Cir. 2006); *Soper ex rel. Hoben*, 195 F.3d 845, 854 (6th Cir. 1999).

> **b.    State-Created Danger Exception**

In order to succeed under the state-created danger exception, Plaintiffs must satisfy the following three elements: "(1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff." *Koulta*, 477 F.3d at 445, citing *Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006).

With respect to the first element, Defendants argue that there is no evidence that April Domine or Stephen House engaged in conduct that increased John Doe's exposure to teasing, taunting, and other types of inappropriate conduct by other students.  Rather, Defendants argue that they took action to ensure that John Doe's safety was protected.  Specifically, Defendants assert that many of the students with whom John Doe alleges caused the problems had to attend school due to Ohio's mandatory school requirement, and many of them had to be in the same Resource Room as John Doe due to their own disabilities.  Essentially, Defendants argue that any danger to John Doe existed irrespective of the actions of Domine or House as John Doe was going to be in the same school with these other students regardless.  Defendants rely on *Bowman v. Williamson Bd. of Educ.*, 488 F.Supp.2d 679, 684 (M.D. Tenn. 2007), citing *McQueen*, 433

F.3d at 466, in asserting that there is no affirmative act where "the victim would have been in the same or even greater danger even if the state officials had done nothing."

Next, is the "special danger" requirement which requires plaintiffs to establish that the state's action placed John Doe specifically at risk as "distinguished from a risk that affects the public at large." *Koulta*, 477 F.3d at 447, citing *Jones*, 438 F.3d at 696.  Defendants argue that there is no evidence that they took any actions that put John Doe at an increased risk.

Plaintiffs, however, argue that Defendants put all these children together, creating "a volatile mix of emotionally and academically disabled children, several of whom were known to have violent tempers and inability to control their behavior and having left them unsupervised in the IEP classrooms and hallways leading to and from such classrooms."  (Pls.' Memo. Contra at 24-25).  Plaintiffs further attempt to distinguish the cases cited by Defendants, and other cases relevant to this issue.  Specifically, Plaintiffs rely on *McQueen* where the Sixth Circuit found that there was a genuine issue of material fact as to the existence of a special danger when the teacher left five students alone in a classroom with an armed classmate.  433 F.3d at 468. However, in *McQueen*, the Sixth Circuit ultimately rejected the plaintiff's claim based on the state-created-danger theory because she could not meet the other two requirements.

To satisfy the third element that defendants knew or should have known that their actions created a danger, plaintiffs must demonstrate that:

> that the state acted with the requisite culpability to establish a substantive due process violation under the Fourteenth Amendment." *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002). The government's conduct must be "so 'egregious' that it can be said to be 'arbitrary in the constitutional sense,'" but the standard is "'no calibrated yard stick.'" *Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846-847 (1998)). "The guiding principle seems to be that a deliberate-indifference standard is appropriate in 'settings [that] provide the opportunity for reflection and unhurried judgments,' but that a higher bar may be

> necessary when opportunities for reasoned deliberation are not present."
> *Bukowski*, 326 F.3d at 710 (quoting *Ewolski*, 287 F.3d at 511 n.5)
>
> We have equated deliberate indifference with subjective recklessness, *Ewolski*,
> 287 F.3d at 513, which means that "the official must both be aware of facts from
> which the inference could be drawn that a substantial risk of serious harm exists,
> and he must also draw the inference," *Sperle v. Mich. Dep't of Corr.*, 297 F.3d
> 483, 493 (6th Cir. 2002) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).
> Subjective recklessness can "be proven circumstantially by evidence showing that
> the risk was so obvious that the official had to have known about it." *Bukowski*,
> 326 F.3d at 710.

*McQueen*, 433 F.3d at 469.

Even if there were a genuine issue of material fact with respect to the first two elements of the state-created danger exception, there is no evidence that Defendants acted with deliberate indifference to John Doe. There is, however, evidence that Defendants took steps to protect John Doe, including meeting regularly with his parents, disciplining the offending students, involving police when necessary and instituting a multi-faceted safety plan and then meeting to review that plan to ensure it was working.

In *S.S. v. Eastern Kentucky University, et al.*, the Sixth Circuit found that school officials were not deliberately indifferent after plaintiff alleged that school officials denied that a bullying problem existed. 532 F.3d 445, 454 (6th Cir. 2008). The school officials responded to all incidents they were made aware of; monitored S.S.; separated S.S. from students; disciplined S.S. and other students involved in altercations; called the police; had the police talk to the students; and called the parents of S.S. and other students to address the situation. *Id.* at 455. Based upon the aforementioned facts, the Sixth Circuit found that the school officials were not deliberately indifferent. *Id.* In the case at bar, the actions of the Defendants, specifically House and Domine, are in line with those defendants in S.S. Defendants House and Domine, along with other school officials, took proactive and affirmative steps to address the inappropriate

-17-

conduct directed at John Doe.  This was not a situation where House and Domine turned a blind eye to John Doe's situation.  Accordingly, Plaintiffs cannot satisfy the state-created danger exception, nor can they show that the actions of Domine and House were so egregious or arbitrary as to have violated John Doe's substantive due process rights.

Even if the Court were to assume for purposes of deciding this Motion that Plaintiffs were able to sufficiently allege a constitutional violation, Plaintiffs must still be able to prove Defendants are responsible for the alleged constitutional violation.

### 2.  Whether the School Board is Responsible for the Constitutional Violation

The School Board will not be held liable unless Plaintiffs can establish "that an officially executed policy, or the toleration of a custom within the school district leads to, causes, or results in the deprivation of a constitutionally protected right." *Monell v. Dep't of Soc. Services*, 436 U.S. 658, 691 (1978); *Doe*, 103 F.3d at 507.  Plaintiffs cannot base their claim against the School Board solely on the actions of school employees, as there is no respondeat superior liability under Section 1983.  *Id.*  A "policy" for the purposes of Section 1983 is "a deliberate choice to follow a cause of action. . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).  A "custom" within the meaning of Section 1983 is a practice that is "so permanent and well settled as to constitute a custom or usage with the force of law." *Feliciano v. City of Cleveland*, 988 F.2d 649, 654-55 (6th Cir. 1993).

Plaintiffs asserts that, as noted in *Doe v. Claiborne County*, no school district would have an affirmative policy condoning personal injury, therefore the Court set forth standards that must be met to state a claim based on an "inaction theory" which is set forth as follows:

(1)     the existence of a clear and persistent pattern of abuse in the school;

(2)     notice or constructive notice on the part of the School Board;

(3)     the School Board's tacit approval of the unconstitutional conduct, such
        that their deliberate indifference in their failure to act can be said to
        amount to an official policy of inaction; and

(4)     that the School Board's custom was the "moving force" or direct causal
        link in the constitutional deprivation.

*Doe*, 103 F.3d at 508; *see also Phillips v. Anderson County Bd. of Educ.*, 2006 U.S. Dist. LEXIS

92120 (E.D. Tenn. 2006).

Plaintiffs argue that "the teachers in Big Walnut schools, particularly the IEP classroom

teachers, permitted and fostered an abusive learning environment by tolerating ongoing bullying

and harassment." (Pls.' Memo. Contra at 21). Plaintiffs further state that the upper

administration should have been monitoring the teachers activity, particularly where students

and their parents were providing evidence that teachers were condoning bullying. Despite

Plaintiffs conclusory statements, the incident reports that are referenced refer to incidents that

occurred in the hallways between classes, in the bathroom, after school, and even at football

games. These incident reports, while concerning, are not evidence that the teachers permitted

and fostered an abusive learning environment. Plaintiffs further reference the frequency of the

incidents, however, there is no evidence that this was unusual amount. Presumably, every school

is going to have similar incidents and altercations between students.

Plaintiffs also argue that the Defendants "never implemented a system of effectively

supervising all areas of the school, the inattentive "policy" created an opportunity for bullies to

act during those times when they knew they would not be stopped." (Pls.' Memo Contra at 22).

However, there is evidence that Defendants attempted to resolve the bullying issues John Doe

was facing in places like the hallways that may not have been fully monitored. Schedules of the

-19-

students involved in the fight with John Doe were adjusted to ensure his safety, he was permitted to leave class early to lessen the interaction with other students, a teacher's aide was assigned to monitor John Doe outside of the classroom, and John Doe was permitted to use the restrooms in the office.  This safety plan imposed by Defendants and agreed to by Plaintiffs, does not support Plaintiffs' theory of inaction by Defendants.  Again, there is no evidence that Defendants turned a blind eye to any incidents Plaintiff John Doe brought to their attention.  Accordingly, there is no evidence of an existence of a clear pattern of inaction or abuse by any school employees.  Nor is there any evidence that Big Walnut's Board of Education tacitly approved the alleged unconstitutional conduct especially considering that Big Walnut had anti-bullying policies in place both before and after the fight on April 17th.  Even assuming that school employees somehow acted contrary to any these anti-bullying policies, Big Walnut cannot be held liable for such behavior because such alleged action would be a departure from Big Walnut's adopted policies.

Finally, liability is imposed on a political entity only where the policy itself is unconstitutional.  *Mann v. Helmig*, 289 F. App'x 845, 851 (6th Cir. 2008) (citing *Bills v. Aseltine*, 958 F.2d 697, 708 (6th Cir. 1992)); *see also Oklahoma City v. Tuttle*, 471 U.S. 808 (1985).  There is no evidence that Big Walnut's anti-bullying policies were themselves unconstitutional.

Based on the aforementioned, Defendants are entitled to summary judgment on Plaintiffs' substantive due process claim.

-20-

**B.    Americans With Disabilities Act Claim[3]**

In claims brought under the Americans with Disabilities Act ("ADA"), based on peer-to-peer harassment, the Sixth Circuit has applied the test set forth in *Davis v. Monroe County Bd. of Education*, 526 U.S. 629, 645-47 (1999).  In accordance with Davis, to maintain a claim for peer-to-peer harassment under the ADA, plaintiffs must establish the following five elements:

> (1) the plaintiff is an individual with a disability, (2) he or she was harassed based on that disability, (3) the harassment was sufficiently severe or pervasive that it altered the condition of his or her education and created an abusive educational environment, (4) the defendant knew about the harassment, and (5) the defendant was deliberately indifferent to the harassment.

*S.S.*, 532 F.3d at 453, citing *Werth v. Bd. of Directors of the Pub Sch. Of Milwaukee*, 472 F.Supp.2d 1113, 1127 (E.D. Wis. 2007).

There is no dispute between the parties that Plaintiff John Doe is an individual with a disability and therefore covered by the ADA.  The parties, however, dispute whether Plaintiff John Doe was harassed because of his disability.  Defendants argue that "[m]any of the students that plaintiffs claim were harassing John Doe are students with disabilities themselves."  (Defs.' Mot. at 11).  Defendants further rely on a statement by Plaintiff David Doe that it was just "speculation" that John Doe was allegedly harassed because of his disability.  There is no question that John Doe has a cognitive disability that limits his ability to learn.  As a result of this disability, he has an IEP and is taught in a special classroom.  One student, 321, testified that

---

[3] Defendants argue, and the Court agrees that if Plaintiffs intended to bring an ADA claim against Domine and House in their individual capacities, that claim must fail.  The Sixth Circuit has held that a proper defendant under Title II of the ADA is the public entity itself or an official acting in his official capacity. *Everson v. Leis,* 556 F.3d 484, 501 (6th Cir. 2009); *Carten v. Kent State Univ.,* 282 F.3d 391, 396-97 (6th Cir. 2002); *Oliver v. Wolfenberger,* 2009 U.S. Dist. Lexis 122871 (E.D. Mich). This is so because 42 U.S.C. §12132 only applies to a "public entity" and under the ADA "public entity" does not include an individual government official. 42 U.S.C. §12131(1); *Lee v. Michigan Parole Bd.*, 104 Fed. Appx. 490, 493 (6th Cir. 2004); *Cox v. Jackson*, 579 F.Supp.2d 831, 850 (E.D. Mich. 2008).

John Doe was bullied because he was known to be in IEP classes.  (Aff. of 321 at p. 3).  This evidence, along with the testimony of Mr. Garrison, is weak at best.  Nonetheless, the Court will deem the first two elements of the *Davis* test met.

As for the remaining elements, Plaintiffs fail to address how they are satisfied. Nonetheless, the Court will assume they are relying on prior arguments raised in the substantive due process claim.

Defendants argue that Plaintiffs cannot establish that any alleged harassment altered John Doe's education or created an abusive educational environment.  The Sixth Circuit has not defined "abusive educational environment" with respect to a claim brought under the ADA, but this Court has set forth the elements of an "abusive educational environment" under Title IX. *See Klemenic v. Ohio State University*, 10 F.Supp.2d 911 (S.D. Ohio 1998) (Marbley, J.). Since the *Davis* test also comes from a Title IX case, it is appropriate to use the test set forth in *Klemenic* to determine if an "abusive educational environment" existed.

Pursuant to *Klemenic*, to satisfy this element a plaintiff must demonstrate that the conduct complained of is sufficiently "severe or pervasive" to affect a "term, condition or privilege" of her education and "create an abusive [educational] environment."  *Id.* at 916.  This test has both a subjective and objective component "(a) the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive; and (b) [p]laintiff must subjectively regard the environment as abusive" *Id.* citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993).  The U.S. Supreme Court has also set forth some factors to consider in determining if an "abusive educational environment" existed:

> The frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the

-22-

> employee's psychological well-being is, of course, relevant to determining
> whether the plaintiff actually found the environment abusive. But while
> psychological harm, like any other relevant factor, may be taken into account, no
> single factor is required.

*Klemenic*, F.Supp.2d at 916, quoting *Harris*, 510 U.S. at 23.

It appears from the testimony that Plaintiff John Doe subjectively believed the environment at Big Walnut Middle School was abusive. However, Plaintiffs must also satisfy the objective component to the aforementioned test. The Court has already discussed that the evidence is very weak that John Doe was harassed because of his disability. Further, there is no evidence that John Doe's education suffered as a result of any perceived harassment. In fact, John Doe's grade point average has increased since seventh grade and at the end of his freshman year in high school in May 2009, John Doe had an approximate grade point average of 3.6. (Mary Doe depo. Vol. II p. 266). Further, John Doe's attendance did not suffer as a result of the alleged harassment and John Doe even participated with the wrestling team both before and after the fight on April 17, 2007. (Mary Doe depo. Vol. II. p. 263; David Doe depo. Vol. II. p. 277, 284-287). Therefore, an objectively reasonable person looking at John Doe's academic performance, his attendance, his participation in school activities such as wrestling, would not find that the environment at Big Walnut Middle School was abusive or hostile.

Finally, Plaintiffs cannot show that Big Walnut was deliberately indifferent to John Doe's needs. As set forth above, Defendants House and Domine took proactive and affirmative steps to address the inappropriate conduct directed at John Doe. Again, this is not a situation where school officials were aware of a situation and did nothing. Rather, school officials took the initiative to put in place a safety plan to protect John Doe and continuously revised the safety

plan to make sure that John Doe was as safe as possible during school while balancing his educational and social needs.

**C.      State Law Claim**

Plaintiffs have asserted a state law claim pursuant to the Ohio Political Subdivision Tort Liability Act, Ohio Revised Code §2744.03(A)(6), alleging that Defendants acted maliciously, in bad faith, and in a wanton and reckless manner.  (Doc. 3 ¶28).  Defendants argue that Plaintiffs' state law claim must be dismissed because Ohio Revised Code §2744.03 only sets forth a defense to liability not an independent basis for liability.  *See Wright v. Mahoning County Bd. of Comm'rs*, 2009 Ohio 561, 2009 Ohio App. LEXIS 439 (Ohio 7th Dist. 2009); *Padula v. Hall*, 2004 Ohio 4823, 2004 Ohio App. LEXIS 4823 (Ohio 7th Dist. 2009), citing *Cater v. City of Cleveland*, 83 Ohio St. 3d 24 (1998).

Plaintiffs merely argue that their Complaint adequately states a tort claim, however, at the summary judgment phase, Plaintiffs must do more than merely state such a claim.  There is no evidence that Defendants acted with malice, wanton and recklessness, or bad faith in the supervision and education of Plaintiff John Doe.  Accordingly, Defendants are entitled to summary judgment on Plaintiffs' state law tort claim.

**D.      Qualified Immunity**

The aforementioned discussion addresses each of Plaintiffs' claims and concludes that Defendants are entitled to summary judgment on all of Plaintiffs' claims.  Therefore, the Court does not find it is necessary to address Defendants' qualified immunity argument.

## IV.    DISPOSITION

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion to File a Sur-reply and

**GRANTS** Defendants' Motion for Summary Judgment.   Defendants are entitled to summary

judgment on all of Plaintiffs' claims.

The Clerk shall remove Documents 27 and 71 from the Court's pending motions list.

The Clerk shall remove this case from the Court's pending cases list.

**IT IS SO ORDERED.**


         _/s/ George C. Smith_
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**